**Affirmed and Memorandum Opinion filed December 1, 2022.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-20-00083-CR

---

**KENIA LASHAN WILKINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court
Harris County, Texas
Trial Court Cause No. 1536960**

---

## MEMORANDUM OPINION

Appellant, Kenia Lashan Wilkins, appeals her conviction for felony murder arguing that she is entitled to a new trial because the State violated her due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). We affirm.

### BACKGROUND

At around 10:30 p.m. on December 26, 2016, police were dispatched to an apartment complex in Houston. When the investigator arrived, he saw

Complainant laying on the street outside an apartment. He observed a gunshot wound on Complainant but no other injury, and there was a single fired casing on the ground nearby. There was no purse or cell phone near her body, and police could not find a purse in her apartment. There also was no weapon found on the scene. The medical examiner determined that Complainant died as a result of a gunshot wound to the chest and neck and that her manner of death was a homicide. Following an investigation, Appellant was indicted for capital murder of Complainant. A four-day jury trial was held on guilt-innocence on January 13, 2020.

During his opening statement, the prosecutor informed the jury that Frederick Campbell would be testifying regarding the circumstances that led to Complainant's murder, how she died, and who was present at the time of her murder. The prosecutor informed the jury that Campbell is a thief and has a criminal record; the prosecutor also stated:

> Another thing I want you to know about Fredrick Campbell is that in exchange for his truthful testimony in this case, we've offered him what's called "Use Immunity." What that means is that anything that he testifies — in exchange for his truthful testimony, anything he testifies to regarding his involvement of the purse snatching, he will not be prosecuted for; and I want you to know that right off the bat.

When the State called Campbell as a witness, Campbell was wearing an orange jumpsuit because he was incarcerated for possession of a controlled substance. He acknowledged that prior to being incarcerated, he was a petty thief, mainly stealing purses. He admitted to having a criminal record and being convicted of burglary, credit card abuse, and several times of theft. Campbell admitted he was "under indictment for credit card abuse and theft here in Harris County" but those two cases were dismissed prior to his arrival to testify. He confirmed that "nobody promised [him] that those cases would be dismissed in exchange for any

2

testimony" and "nobody's made any promises to [him] that those cases would stay dismissed." He acknowledged that the State may not use his truthful trial testimony against him per the State's motion to compel testimony and grant use immunity, which the trial court granted and admitted into evidence.

With this backdrop, the jury heard the following testimony from Campbell. He stated that he met Appellant at the Kings Row Apartments where he "chose to hang out." He would be "around" Appellant fairly frequently — around two to three times a week. Campbell admitted that he would spend his time "[c]ommitting thefts." He did not have a car so he paid Kenny Smith, whom he also met at Kings Row Apartments, to drive him around so he could commit thefts. Smith would decide on a location or area and Campbell would commit the theft.

During the day on December 26, 2016, Campbell intended to steal another purse so Smith drove him to an ice cream parlor. Campbell took a "window puncher" with him in case he needed to break into a car to steal a purse left in the car. Campbell testified he never took a gun with him because "I never intend to cause physical harm to nobody during my time of committing the crimes that I commit." He admitted grabbing a purse at the ice cream parlor and then running away; video was introduced of Campbell committing the theft. Thereafter, he and Smith drove back to the Kings Row Apartments to Campbell's cousin's apartment and smoked marihuana. Appellant was also at the apartment. Campbell asked Appellant if she wanted to join him in committing another theft, *i.e.*, "snatch another purse."

However, before committing another theft, Smith drove Appellant and Campbell to Walmart to buy a television with the credit card that had been in the purse Campbell had stolen at the ice cream parlor. Video was introduced showing Appellant using a credit card to pay for the television and then walking out of the

3

store carrying the television. Campbell confirmed Appellant used the stolen credit card. Appellant, Campbell, and Smith then drove back to Campbell's cousin's apartment where they stayed for some time.

Later that same evening, Appellant, Smith, Campbell, and another male named Kevo left the apartment to steal another purse. Smith was the driver; Kevo sat in the passenger front seat because he was disabled and could not move easily; Campbell sat behind Smith; and Appellant sat behind Kevo. The plan was to "take another purse from whoever we came across." No plan was made because it "was pretty much understood . . . what was about to happen" and "we were aware of what we were about to do." There was no discussion about taking a weapon nor was Campbell aware that there was a weapon in the car; he only took his window puncher.

Smith stopped at a gas station where they saw Complainant. Campbell testified "that's usually how I come across people." They followed Complainant to her apartment complex, and Smith "pulled up behind the car." Campbell described the "game plan" as follows: "It was between everybody that was in the car pretty much self-explanatory, either she was gonna get out with the purse and one of us was gonna get out the car and go up to her and take it; or she was gonna leave it inside the car and we were gonna break the window to get it out." However, according to Campbell, neither "of those two things happened." Campbell stated that Appellant deviated from the plan. Smith "pulled up behind the car, and that's when [Appellant] got out the car, went to the victim. The victim screamed, not a loud scream; and the victim was shot." Campbell stated "[a]fter the gunshot, [he] did look that way; but during it, [he] wasn't because [he] wasn't expecting it."

Campbell testified that after he heard the scream and the shot, he leaned over and held the door so Appellant could get back in the car. As he "looked over in

4

that direction," Campbell saw Appellant bent down "over the victim with the purse and coming back to the car." Campbell testified that Appellant ran back to the car holding a semiautomatic gun and Complainant's purse. He testified that "the purse tried to be passed to me, but I was in the midst of yelling and I was mad. So, I didn't take it, and the purse was then passed to the front seat, and after that it was me just doing a lot of yelling." He stated he demanded that Smith take "him back to the hood" and continued cussing. He stated he was mad "[b]ecause somebody got killed or shot and that wasn't supposed to happen at all." Campbell testified he was very angry at Appellant, blamed her for what had happened, and continued yelling at her, but Appellant's demeanor "was nonchalant." Campbell remembered Appellant just "smoking a cigarette and looking out the window." After arriving at the Kings Row Apartments, Campbell did not "participate in dividing up the stuff from that purse." He did not know what happened to the purse or the gun. Campbell stated that he never saw Appellant again after that night.

Appellant's trial counsel cross-examined Campbell at length, eliciting his lengthy criminal record including convictions for theft and credit card abuse. Trial counsel also elicited testimony regarding his drug use, former gang affiliation, and immunity deal which Campbell agreed was "a pretty good deal." An exchange also occurred regarding the dismissal of pending felony charges for credit card abuse and theft against Campbell:

> [TRIAL COUNSEL:] They dismissed both of your felony charges, right?
>
> [CAMPBELL:] Correct.
>
> [TRIAL COUNSEL:] And the Prosecutor, Mr. Driver, says, well, you know, there ain't no promises, we could refile, right?
>
> [CAMPBELL:] Correct.
>
> [TRIAL COUNSEL:] Cause you're a two-time loser, right?

5

[CAMPBELL:]  Correct.

[TRIAL COUNSEL:]  But the statute of limitations has run on these state jail felonies, your lawyer told you, they can't refile, right?  Did your lawyer tell you that?

[CAMPBELL:]  Correct.

              \*                      \*                    \*

[TRIAL COUNSEL:]  You were guilty of credit card abuse, right?

[CAMPBELL:]  Correct.

[TRIAL COUNSEL:]  You were guilty of theft from person, correct?

[CAMPBELL:]  Correct.

The jury also heard testimony from several other witnesses.  After considering the evidence presented, the jury found Appellant guilty of felony murder.  The trial court sentenced Appellant to 50 years' confinement and certified Appellant's right to appeal.  Appellant timely filed her notice of appeal.

## ANALYSIS

Appellant asks us to reverse her conviction and remand the case to the trial court for a new trial, raising the following issue on appeal:

> The State committed a *Brady* violation by only disclosing to appellant that their star witness, Mr. Campbell, was not given any promises or consideration regarding a theft from a person charge and a credit card abuse charge that had been dismissed prior to trial, but alleged that the dismissals were only to facilitate Mr. Campbell's transfer to the Harris County Jail.  The State never disclosed that legally they could refile those cases and prosecute Mr. Campbell for those offenses, but that they chose not to do so.  This failure to disclose this information prevented the jury from having crucial information needed to weigh the credibility of Mr. Campbell who provided the sole evidence that appellant shot and killed the complainant.

The State counters that Appellant failed to preserve her *Brady* complaint because she did not raise it in the trial court.

## I.  *Brady* Claim

Under *Brady* and its progeny, the suppression of evidence that is favorable to a defendant constitutes a due process violation if the evidence is material to the defendant's guilt or punishment. *Ex parte Chaney*, 563 S.W.3d 239, 266 (Tex. Crim. App. 2018); *Brady*, 373 U.S. at 87. It is irrelevant whether the evidence was suppressed inadvertently or in bad faith, and the defense need not request disclosure because the State has an affirmative duty to disclose. *Ex parte Chaney*, 563 S.W.3d at 266; *see also Thomas v. State*, 841 S.W.2d 399, 407 (Tex. Crim. App. 1992) (en banc). Thus, the State's duty to reveal *Brady* material attaches when the information comes into its possession, not when it is requested. *Jackson v. State*, 495 S.W.3d 398, 420 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

Evidence that could be used effectively to impeach a prosecution witness is evidence favorable to the defendant for *Brady* purposes. *Id.*; *see also Arroyo v. State*, 117 S.W.3d 795, 796 n.1 (Tex. Crim. App. 2003). "Suppressed evidence is material if there is a reasonable probability that the result of the trial would have been different if the suppressed evidence had been disclosed to the defense." *Ex parte Chaney*, 563 S.W.3d at 266. A reasonable probability is one sufficient to undermine confidence in the outcome of the trial. *Id.* "When assessing materiality, the suppressed evidence is considered collectively, not item-by-item." *Id.*

Appellant raises her *Brady* complaint for the first time on appeal. But to preserve error for appellate review, an appellant must present to the trial court a timely, specific objection and obtain an adverse ruling. *See* Tex. R. App. P. 33.1(a)(1); *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999); *see also Valdez v. State*, No. AP-77,042, 2018 WL 3046403, at *16 (Tex. Crim. App. June 20, 2018) (not designated for publication). To be timely, a *Brady* complaint must

be made as soon as the ground for complaint is apparent or should be apparent. *Wilson*, 7 S.W.3d at 146; *see also Valdez*, 2018 WL 3046403, at \*16. Further, *Brady* claims typically are raised in a motion for new trial because a *Brady* claim requires a defendant to show by a preponderance of the evidence that evidence was withheld, that it was favorable to the defense, and that the evidence was material. *Jackson*, 495 S.W.3d at 420; *see also Keeter v. State*, 175 S.W.3d 756, 760-61 (Tex. Crim. App. 2005). This showing can be made with evidence presented at a motion for new trial hearing. *Jackson*, 495 S.W.3d at 420.

Here, Appellant failed to raise a *Brady* claim in the trial court; thus, she failed to preserve any alleged error. *See id.*; *see also Keeter*, 175 S.W.3d at 759-60. Accordingly, we overrule Appellant's issue with regard to her alleged *Brady* violation.

## II. False-Evidence Claim

Further, to the extent Appellant attempts to also assert a false-evidence claim and assuming *arguendo* that Appellant preserved such a claim for review, it is without merit.

A conviction based on materially false evidence results in a due process violation, regardless of whether the State knows the falsity of the evidence at the time of trial. *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015); *see also Ukwuachu v. State*, 613 S.W.3d 149, 157 (Tex. Crim. App. 2020). A false-evidence claim must be supported by facts showing that some evidence was presented to the jury that was demonstrably false or misleading. *Ukwuachu*, 613 S.W.3d at 157. Thus, to be entitled to relief on the basis of false evidence, an appellant must show that (1) false evidence was presented at her trial, and (2) the false evidence was material to the jury's guilty verdict. *Ex parte De La Cruz*, 466 S.W.3d at 866; *see also Ukwuachu*, 613 S.W.3d at 157. An appellant must prove

8

the two prongs of her false-evidence claim by a preponderance of the evidence. *See Ex parte De La Cruz*, 466 S.W.3d at 866.

Appellant specifically points to the following question her trial counsel asked Campbell at trial: "But the statute of limitations has run on these state jail felonies, your lawyer told you, they can't refile, right? Did your lawyer tell you that?" Appellant contends that her counsel's "false statement" that Campbell "could not be legally prosecuted for [the credit card abuse and theft he committed on the day of Complainant's murder] because the statute of limitations had run left [a] false impression in the minds of the jury that the law precluded these prosecutions" when "[t]he reality is the State was not legally prohibited from prosecuting Mr. Campbell for these crimes, but the State never corrected the false impression regarding the law, and never disclosed to appellant or the jury that they, in fact, chose to not refile those cases and prosecute" Campbell.

First, Appellant's trial counsel did not make a false statement regarding the statute of limitations. Instead, counsel questioned Campbell whether *his attorney had told him* that the State cannot refile charges against him because the statute of limitations had run. In response to the question, Campbell only confirmed what *his attorney told him* — not whether Campbell or his attorney correctly believed the statute of limitations had run. A counsel's questions are not evidence. *See Ukwuachu*, 613 S.W.3d at 157 (recognizing questions posed by attorney are not evidence); *Madden v. State*, 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2007) (same); *Costilla v. State*, 650 S.W.3d 201, 217 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (stating that "[c]ounsel's questions, of course, are not evidence").

Second, nothing supports Appellant's claim that "[t]he jury was left with the false impression that the State did not promise Mr. Campbell that he would not be prosecuted for credit card or abuse or theft from a person that occurred on the same

9

day as complainant's killing." Appellant points to no evidence that the State promised Campbell that he would not be prosecuted for the two dismissed cases, nor have we found such evidence in the record. In fact, the only evidence in the record shows that the State made no promises to Campbell regarding whether it would refile charges against him. During direct examination, Campbell admitted he was "under indictment for credit card abuse and theft here in Harris County" but those two cases were dismissed prior to his arrival to testify. He confirmed that "nobody promised [him] that those cases would be dismissed in exchange for any testimony" and "nobody's made any promises to [him] that those cases would stay dismissed." During cross-examination, Campbell confirmed that the prosecutor told Campbell "there ain't no promises, [the State] could refile."

Therefore, we conclude that Appellant failed to show that false evidence was presented at trial, and any asserted false-evidence claim is without merit. Accordingly, we overrule Appellant's issue.

## CONCLUSION

We affirm the trial court's judgment.

/s/     Meagan Hassan
Justice

Panel consists of Justices Jewell, Zimmerer, and Hassan.
Do Not Publish — Tex. R. App. P. 47.2(b).

10